AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>CORY PIERCE | DOCKET NO. |
| | MAGISTRATE'S CASE NO. **13-0219M** |

Complaint for violation of Title 18, United States Code, Section 666(a)(1)(B)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE FREDERICK F. MUMM | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>Feb. 4, 2012 to Feb. 3, 2013 | PLACE OF OFFENSE<br>San Luis Obispo Co. | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [18 U.S.C. § 666(a)(1)(B)]

CORY PIERCE, an agent of the City of San Luis Obispo, based on his employment as a detective with the San Luis Obispo Police Department, corruptly solicited, demanded, accepted, and agreed to accept, cash from CW1 and CW2 intending to be influenced and rewarded in connection with any business, transaction, or series of transactions of the City of San Luis Obispo, involving a thing of value of $5,000 or more.

FILED
CLERK, U.S. DISTRICT COURT
FEB - 4 2013
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>DIETER WILLKOMM /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>Frederick F. Mumm | DATE<br>February 4, 2013 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Brandon D. Fox x0284    REC: Unsecured Bond

**AFFIDAVIT**

I, DIETER WILLKOMM, being duly sworn, declare and state as follows:

## I.    **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for approximately 15 years.  I am currently assigned to the Santa Maria Residence Agency of the Los Angeles Division of the FBI.  My duties and responsibilities include the investigation of federal criminal statutes, including suspected violations involving bribery of public officials.

2.      I make this affidavit in support of an application for a criminal complaint and arrest warrant of CORY PIERCE.  Based on what I describe below, I submit that there is probable cause to believe that from February 4, 2012 to February 3, 2013, PIERCE, an agent of the City of San Luis Obispo, based on his employment as a detective with the San Luis Obispo Police Department, corruptly solicited, demanded, accepted, and agreed to accept, cash from CW1 and CW2 intending to be influenced and rewarded in connection with any business, transaction, or series of transactions of the City of San Luis Obispo, involving a thing of value of $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B).

3.      The facts set forth in this affidavit are based upon my personal observations, recorded conversations, interviews I have conducted, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   **CORY PIERCE**

4.      PIERCE is a detective with the San Luis Obispo Police Department, which is an agency of the City of San Luis Obispo.  PIERCE was hired on September 27, 2006, and is assigned to a narcotics task force with the San Luis Obispo Sheriff's Office.

5.      The City of San Luis Obispo is a local government as defined by 18 U.S.C. § 666 in that from February 4, 2012 to February 3, 2013, it received benefits in excess of $10,000 under a federal program.  For example, in or about May 2012, the City of San Luis Obispo received a U.S. Department of Justice grant to fund police safety equipment.

## III.   **STATEMENT OF PROBABLE CAUSE**

*Summary of Probable Cause*

6.      On January 7, 2013, I interviewed Cooperating Witness 1 ("CW1") at the San Luis Obispo Sheriff's Office, where she was being detained after being charged with entering a commercial dwelling, burglary, and grand theft.[1]  On January 8, 2013, I interviewed her boyfriend, Cooperating Witness 2 ("CW2"), who agreed to cooperate in the investigation.[2]  Each told a similar account of illicit dealings they had with PIERCE.

7.      According CW1 and CW2, they became sources for PIERCE in late 2011, after PIERCE arrested CW2 for possession of heroin.  CW1 and CW2 stated that PIERCE was allowing CW2 to act as a source so that he could "work off" his charge.  As described below,

---

[1] CW1 says that she is a drug addict and that her memory has been harmed by her abuse of methamphetamines.  Based on my review of her criminal history report, CW1 has been arrested numerous times and has been convicted of several offenses, including possession of a controlled substance, burglary, petty theft, and grand theft.

[2] CW2 is CW1's boyfriend.  CW2 has reported using and selling drugs over the years.  Based on my review of his criminal history report, CW2 has been arrested several times and has been convicted of possession of an assault weapon, driving with a suspended license, and domestic battery, which all are misdemeanor offenses.  After CW2 began cooperating in this investigation, the FBI paid his cellular phone bill of approximately $136.

however, PIERCE began to provide placebo oxycodone pills he embezzled from the San Luis Obispo Police Department and methamphetamines[3] to CW1 and CW2 in exchange for several thousand dollars cash, oxycodone and hydrocodone,[4] heroin,[5] and drugs that treat opiate addiction.

8.      According to CW2, PIERCE performed several official acts for CW1 and CW2 in order to reward them for acquiring cash, oxycodone, and heroin for PIERCE.  Specifically, PIERCE has used his position as a police officer to influence CW2's probation officer to perform little to no supervision of CW2, despite his heroin arrest.  CW2 stated that he has spoken to his probation officer minimally since PIERCE arrested CW2 for possession of heroin.  Additionally, CW2 said that his probation officer has not asked CW2 to take drug tests or go to probation classes, as CW2 would normally have to do.  Further, after they began working as PIERCE's sources and providing him with pills, PIERCE began providing CW1 and CW2 with information about investigations so they would not be caught purchasing drugs, according to CW2.  CW2 stated that PIERCE would inform them which drug houses to stay away from and would advise them to get their drugs from other locations.

9.      Since CW2 began to cooperate with the FBI, he has recorded conversations in which PIERCE has provided CW2 hundreds of placebo oxycodone pills in exchange for an even split of $11,000, which represents the amount of money CW2 told PIERCE he obtained by selling the placebo pills.

**PIERCE's Historical Dealings with CW1 and CW2**

---

[3] Methamphetamine is a Schedule II controlled substance.

[4] Oxycodone and hydrocodone are Schedule II controlled substances.  Narco and Vicodin, which contain hydrocodone mixtures, are a Schedule III controlled substance.

[5] Heroin is a Schedule I controlled substance.

10.     CW1 said that initially PIERCE would ask her for information about different individuals, but that this changed in approximately March 2012 when PIERCE called her to inform her that he had injured his back and wanted pain pills, specifically Norcos and Vicodin (which are both a mixture of acetaminophen and hydrocodone).  CW1 stated that PIERCE asked CW1 if she knew where to get them.  According to CW1, she was at a drug dealer's residence at the time of the telephone call and she thought that PIERCE was testing her as a source.  CW1 stated PIERCE informed CW1 that he wanted twenty pills.  According to CW1, she purchased twenty pills from the drug dealer for a total of $60 and met PIERCE, who was driving a white Chevrolet pickup truck that was not his normal work vehicle, at a local grocery store.  CW1 stated that PIERCE gave her $20 for the pills, which meant that CW1 had lost $40 on the transaction.

11.     CW1 said that PIERCE began calling her at strange hours, such as late at night and in the early morning, asking for more pills.  CW1 said that PIERCE eventually paid back the $40 CW1 had lost in the first transaction.

12.     CW1 and CW2 both recalled an incident that occurred in Avila Beach, CA, in approximately June 2012.  According to CW2, PIERCE asked CW1 and CW2 to set up a deal to buy morphine pills from Individual A.  According to CW1, once Individual A arrived, CW2 provided PIERCE with Individual A's license plate number over the telephone.  CW1 stated that PIERCE asked CW2 if Individual A had the pills on him, and that CW2 responded that Individual A did have the pills.  According to CW1 and CW2, after Individual A drove away from the meeting, PIERCE stopped Individual A's car at gunpoint, seized the morphine pills and some fireworks from Individual A's car, and let Individual A go without charges.  According to CW1, after PIERCE seized the morphine pills and fireworks, PIERCE gave CW1 and CW2 at

4

least some of the fireworks. CW1 stated that PIERCE kept all of the pills, but CW2 recalled that PIERCE gave 30 pills to CW1 and kept 150 pills for himself. CW1 stated that Individual A later asked CW1 and CW2 about their role in the seizure and they "denied it all."

13.     According to CW1, PIERCE eventually began giving her placebo oxycodone pills so that CW1 could trade them for pain pills that CW1 would give to PIERCE, and that PIERCE would occasionally provide her with methamphetamines as a reward. CW1 stated that PIERCE informed her that the placebo pills came from an evidence locker. CW1 said that PIERCE mentioned a couple of times that he had to go into the evidence room to obtain them and it was difficult to get in there.

14.     Specifically, according to CW1, around July 4, 2012, she was "on a bad runner" and was tripping after she and CW2 had gotten into a physical altercation. CW1 stated that around this time, PIERCE gave her placebo oxycodone pills that she was to trade with others to obtain pain pills for PIERCE. CW1 said that after she made the trade, the individuals who gave her the pain pills for the placebo pills were "after me." CW1 stated that PIERCE asked who those individuals were and stated, "I'll get them. I'll take care of it." According to CW1, PIERCE gave her methamphetamines for obtaining these pain pills for him. She stated that this was the first time that he gave her methamphetamines.

15.     CW1 said that PIERCE provided her with methamphetamines on four or five occasions. According to CW1, PIERCE began only providing her with a small amount of methamphetamines, but that he later gave her more than an "eight ball." CW1 stated that PIERCE would sometimes give her methamphetamines while they were still in evidence bags. She described the bags as "heavy duty plastic bags" with a "tear tag" at the top. She further

described the bags as having "a number" and writing on them that referred to the San Luis Obispo's Sheriff's Office.

16.     CW1 stated that PIERCE began trading her "pill for pill." She recalled a meeting with PIERCE at the Sycamore Mineral Springs parking lot. At that meeting, according to CW1, PIERCE gave her benzodiazepine pills in exchange for opiate pills.[6]

17.     CW1 said that PIERCE also provided her with methamphetamines in about September 2012, but that she did not have any pills to exchange for the methamphetamines. CW1 stated that there were times that PIERCE gave CW2 methamphetamines for CW2 to provide to CW1.

18.     According to CW1, she went to emergency rooms and to her doctor to obtain prescriptions for Vicodin and Norco pills so she could give them to PIERCE. CW1 stated that after she obtained a prescription for Vicodin in approximately October 2012, PIERCE followed her to a Wal-Mart in Arroyo Grande, CA, where she dropped off the prescription to be filled. According to CW1, after she learned how much the Vicodin prescription would cost, she met PIERCE outside while the prescription was being filled. CW1 stated that PIERCE gave her money to pay for the prescription. CW1 said she then paid for the Vicodin pills and gave them to PIERCE.

19.     According to CW1, the last time she obtained pain pills for PIERCE was in approximately mid-November 2012, before she was arrested on her pending charges. At that time, CW1 said that she provided PIERCE with twenty-one Norco pills in exchange for PIERCE's promise to deliver placebo Oxycodone pills to her. CW1 stated that she was arrested before receiving those placebo pills from PIERCE.

---

[6] Benzodiazepine is a Schedule IV controlled substance.

20.     According to CW1, she would "freak[] out" when PIERCE contacted her because this was "a cop asking us." CW1 stated that the situation was "weird and I didn't want to do it." CW2, however, stated that CW1 thought it was exciting to work with PIERCE and that she felt it was something that only happened in the movies.   CW2 believed that whenever CW1 would "get clean," PIERCE would get her "back in the drug game."

21.     Once CW1 was arrested and detained for her pending charge, PIERCE began giving CW2 placebo pills in exchange for heroin, according to CW2.  According to CW2, PIERCE was helping CW2 in CW2's dealings with his probation officer.

22.     Specifically, CW2 stated that on or about November 22, 2012, PIERCE gave CW2 fifty placebo pills.  In return, CW2 provided PIERCE with $1,000 and three grams of heroin.  According to CW2, PIERCE asked for advice on how to ingest the heroin.  PIERCE contacted CW2 later that evening and informed CW2 that he had taken twice as much heroin as CW2 had suggested and had shot it into his thigh.

23.     CW2 said that PIERCE informed him a few days later that PIERCE had run out of heroin and wanted more.  According to CW2, PIERCE gave CW2 fifty additional placebo pills to sell to Individual B, a drug dealer in Atascadero, CA, in exchange for $1,500 and more heroin.  CW2 stated that he gave the placebo pills to Individual B, but that Individual B said that someone had ripped off Individual B and that, as a result, Individual B could not pay for the pills.  CW2 said that PIERCE believed that CW2 had ripped him off.  According to CW2, PIERCE stated that the deal was off and that CW2 would have to start dealing with his probation officer.

24.     CW2 believes that PIERCE was getting oxycodone pills from other sources, because his rate of ingestion was greater than the number of pills CW1 and CW2 provided to

PIERCE.  Additionally, CW1 said that a methamphetamine dealer, Individual C, said that he had

PIERCE "under my thumb" and that Individual C was not acting as though he were in fear of the

law any more.

25.     As mentioned above, PIERCE is currently assigned to a narcotics task force.  A

detective on the task force has recently reviewed the informant files for this task force.  The

detective found that PIERCE has not created any informant files for CW1 or CW2.  Further, the

detective searched CW1's and CW2's names in evidence and case activity databases, but found

no evidence logs or criminal cases that listed either CW1 or CW2 as a subject or informant.  The

detective states that no evidence logs or criminal cases for the task force even mention CW1 or

CW2 by name in any manner.

### Pierce Sells Additional Placebo Pills for $11,000 in Covert Operation

26.     Beginning in January 2013, CW2 agreed to record conversations with PIERCE.

On approximately January 19, 2013, CW2 recorded a telephone call with PIERCE in which

PIERCE stated that he had just returned from Hawaii.  PIERCE stated that he was "sick" because

he ran out of Suboxone the previous day while in Hawaii.[7]  PIERCE stated that he needed more

Suboxone and asked for CW2 to get him some.  CW2 said that he was having a hard time getting

in touch with Individual B, who had provided him with Suboxone in the past.  PIERCE stated

that he had Individual B's "phone tolls" and would see what Individual B was "up to."  CW2

informed PIERCE that CW2 only had "a half of one."  According to CW2, he then met with

PIERCE in CW2's vehicle and gave PIERCE some Suboxone in an unrecorded meeting.  CW2

said PIERCE informed CW2 that if Individual B paid the $1,000 he owed, PIERCE would get

---

[7] Suboxone contains buprenorphine, which is a Schedule III controlled substance.  Suboxone is used to treat opiate addictions.

CW2 more pills.  PIERCE informed CW2 that PIERCE was done getting high and was going to attend a Narcotics Anonymous class, according to CW2.[8]

27.     On January 23, 2013, CW2 recorded a telephone conversation with PIERCE.  In the call, CW2 asked PIERCE if he had oxycodone for the "other guy."  PIERCE said that he could "get some more," but that he did not want to "do it too much."  PIERCE instructed CW2 to state that there would be no fronting of the pills and that the buyer should "get the money" together because it "took too long" the last time.  CW2 asked how many pills PIERCE could obtain and suggested that they sell the pills for $30 each.  PIERCE said that he could "do, like, 50," but he would have to "see what I got at the office."  PIERCE said that he would see CW2 in "ten minutes."

28.     On January 23, 2013, at approximately 3:00 p.m., CW2 recorded a meeting with PIERCE near Avila Beach, CA.  Before the meeting, the FBI provided CW2 with $1,000 to pay PIERCE.  According to surveillance, PIERCE arrived at the meeting in a Silver Dodge Durango.  Once PIERCE arrived, CW2 entered PIERCE's car and spoke to PIERCE.  During the conversation, CW2 stated that he had to pay Individual D $50 to give CW2 a ride to pick up the money from Individual B.  According to CW2, he provided PIERCE with the $1,000 from the FBI.  PIERCE asked whether CW2 wanted to split it.  CW2 suggested that they split it fifty-fifty.  PIERCE then counted from one to four.  CW2 said that if Individual B came through with the $1,500 for the 50 pills that CW2 would get his car fixed and would put money on CW1's jail account.  PIERCE said that he did not want to do this a bunch of times because he did not want to get in trouble.  PIERCE said that he would do it one more time to help CW2.  PIERCE

---

[8] My descriptions of recorded conversations are summaries based on my review of the recordings, and my understanding of the context of the recorded conversations.  These descriptions are not based on a final, verbatim transcript.  Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in a recorded conversation.

explained that after one more deal, he wanted CW2 to introduce an undercover officer to Individual B so that PIERCE could engage in a drug deal with Individual B and then arrest him. PIERCE said that nothing that CW2 had done for PIERCE would be in any reports or any warrants. CW2 informed PIERCE that he was going to get a phone card so he could call CW1. PIERCE instructed CW2 to be careful on the phone because people listening to phone calls at the jail where CW1 is detained. PIERCE told CW2 that he should let PIERCE know if he obtained Suboxone. PIERCE said that he still had a bunch left, but he was trying to go really slow. PIERCE stated that he would only take a small amount that night. PIERCE said that the pills were addictive. PIERCE informed CW2 that he needed to increase the prices up on the placebo pills. PIERCE instructed CW2 to tell Individual B that his supplier was running out and would be bumping the price up to $20 per pill.

29.     After the January 23 meeting, CW2 provided agents with $200. CW2 also recorded another conversation with PIERCE. CW2 informed PIERCE that he had spoken to Individual B, who was working on getting the cash. CW2 stated that Individual B had Suboxone.

30.     After listening to the recording of the January 23 meeting, FBI agents confronted CW2 about whether PIERCE had split the $1,000 evenly with CW2. CW2 admitted that he had given PIERCE $500 and had kept a total of $500. CW2 then provided agents with the additional $300.

31.     On January 24, 2013, CW2 recorded a telephone conversation with PIERCE. PIERCE stated that he was "on my way home" and that he had "100" for Individual B. CW2 asked PIERCE what he wanted per pill and suggested $30 each. PIERCE said that he wanted $30 per pill for 50 pills and $20 per pill for 100 pills. PIERCE stated that he would be giving a

"price break if he buys the whole thing." PIERCE told CW2 "do not give them to [Individual B] until you get the money in your hand." CW2 stated that he would call Individual B.

32.   . In the morning of January 25, 2013, CW2 recorded a telephone conversation with PIERCE. CW2 informed PIERCE that Individual B "got some guy up in Salinas" who "might come down here on Sunday [January 27, 2013]." CW2 informed PIERCE that Individual B was selling the pills for $40 to $60 each. PIERCE stated that he was working on "gang stuff" that day. That afternoon, CW2 recorded another conversation with PIERCE in which PIERCE stated that he was in North County serving warrants and participating in a gang sweep. PIERCE said that he would "swing through there" and "drop those off" later.

33.   That evening, CW2 recorded a meeting with PIERCE in Avila Beach. Before the meeting, agents searched CW2 and found no contraband. Agents observed PIERCE arrive in a silver Dodge Durango and saw CW2 enter the vehicle. CW2 asked, "what, you got a hundred, a hundred in there?" PIERCE said, "yeah." PIERCE asked how Individual B would "get the cash for this?" CW2 said that Individual B had "eight hundred bucks" and there would be "this guy coming down from Salinas" to pay Individual B for the pills. PIERCE again discussed setting up an undercover meeting with Individual B so he could arrest him. PIERCE explained that the pills were not in evidence, but were instead in "my desk drawer." PIERCE stated that all he needed to do to get the pills originally was to "write a little letter . . . and have it signed by my boss . . . and faxed it to . . . Purdue Pharmaceuticals."[9] PIERCE explained that the pills "came in the mail." PIERCE explained that once a year he is supposed to account for what he did with the pills. CW2 asked PIERCE if PIERCE recalled "the hundred that you gave [CW1] that one time? Oh, it was like eighty." PIERCE said he remembered. CW2 stated that CW1 made money

---

[9] According to Louis Bauza, who is the director of investigations at Purdue Pharma, the company provides placebo pills to law enforcement agencies to assist with their investigations.

selling the pills.  PIERCE stated, "bitch didn't fucking pay me or give me anything . . . I gave her so many of those things . . . four bottles of those."  PIERCE said that CW2 should trade the pills for "two thousand bucks and a couple of Suboxone, we'll call it good."  After the meeting, CW2 provided agents with one white bottle containing one-hundred pills.  Agents searched CW2 and found no money or contraband.

34.     In the morning of January 28, 2013, CW2 recorded a message he left on PIERCE's cellular phone in which CW2 informed PIERCE that he "got the cash" from Individual B and that CW2 had "an itchy finger."  Later, CW2 recorded a conversation he had with PIERCE.  CW2 informed PIERCE that Individual B "came through."  PIERCE asked if Individual B had given CW2 "any Suboxone."  CW2 informed PIERCE that CW2 had forgotten to obtain any from Individual B.  PIERCE said that he was out of Suboxone and was "hurting."  CW2 stated that he would call Individual B back to ask about Suboxone.  PIERCE responded that he would meet CW2 in "a couple of hours."

35.     Later that day, CW2 recorded a meeting with PIERCE.  Before the meeting, agents searched CW2 and found no contraband.  Agents provided CW2 with $2,000 to pay PIERCE.  An agent observed PIERCE arrive in a silver Dodge Durango bearing license plate number 6KCL133, and saw CW2 enter the car.  PIERCE stated that they should keep doing these deals.  CW2 counted to twenty and stated that it was like taking candy from a baby.  PIERCE said that he thought CW2 was taking half.  CW2 said that this was PIERCE's decision.  PIERCE said that CW2 should get his car fixed with the money.  CW2 then counted from one to ten.  PIERCE said that after CW2 got his car fixed, he should get PIERCE some Suboxone.  CW2 said that he had forgotten about getting PIERCE Suboxone.  CW2 told PIERCE that CW1 informed him that she had given PIERCE Vicodin in exchange for the placebo pills.  PIERCE

said that CW1 gave him some, but not a lot of Vicodin.  CW2 said that CW1 stated that she gave

PIERCE some Norco pills and some Vicodin.  PIERCE interjected that CW2 should not be

talking about him on the jail phones.  CW2 informed PIERCE that Individual B's friend wanted

one hundred more pills at $40 each.  PIERCE asked if that was what Individual B told CW2.

CW2 said that this would be $4,000.  CW2 said that PIERCE needed to get CW2 some

methamphetamines.  PIERCE stated that he was not doing that anymore and that he did not want

to overdo it because someone would notice.  PIERCE said that he was down to two more packs

and that each pack contained eight 100 pill containers.  PIERCE said that he would do it for $40.

CW2 said that he would tell Individual B that they had 200 pills left and see if Individual B's

friend could come up with $8,000.  PIERCE asked if CW2 could imagine what Individual B

would do if he knew he was buying the pills from a cop.  After the meeting, CW2 provided

agents with $1,000, and a search determined that he had no other money or contraband on him.

36.     On January 30, 2013, agents met CW2 to prepare him for a scheduled meeting

with PIERCE.  Because PIERCE was executing a search warrant, there was a delay in CW2's

scheduled meeting with PIERCE.  During the delay, agents drove CW to his residence and then

to San Luis Obispo.  Agents re-searched CW2 and found $2,100 hidden in CW2's shoe.  CW2

claimed that he picked up the money at his residence, it was CW2's father's money, and that

CW2's father had asked him to provide the money to CW2's uncle.[10]

37.     That evening, CW2 recorded a conversation with PIERCE.  PIERCE said that he

was heading home after "we got a guy with heroin."  CW2 asked PIERCE "how much did you

grab?"  PIERCE responded that he did not grab any.  CW2 informed PIERCE that Individual B

was "biting at the bit."  PIERCE asked if Individual B had the money.  CW2 said that Individual

---

[10] Earlier in the day, CW2 told agents that he had provided this money to his uncle already.

B's friend was "coming Friday." PIERCE affirmed that he wanted $8,000. PIERCE said that he

wanted to pick up the pills, but that a deputy was going to be there to drop off the evidence.

PIERCE stated that he would grab the pills in the next couple of days. CW2 said that Individual

B took $17,000 to Santa Barbara the other day and that Individual B had $56,000. CW2

suggested that they "jack" Individual B's friend. PIERCE stated that receiving money for the

pills was "jacking them." PIERCE and CW2 laughed. PIERCE said that it would be pushing it

to get more pills and that if Individual B "does this deal," PIERCE would bust him on the next

deal. PIERCE said that he would "bust him with all the cash and take [Individual B's] money."

PIERCE stated he would have to bring the "other officers" and could not "do it by myself."

PIERCE said that if he got the other officers involved they would "seize the money." CW2

responded that PIERCE did not want to get other officers involved. PIERCE replied, "probably

not." CW2 said that Individual B would not "freak[] out" as Individual A did. CW2 stated that

Individual B would simply "go to the house and lick his wounds." PIERCE said that he did not

want to "do it by myself" because he did not know "who this dude is." PIERCE said he wanted

to "do this deal." PIERCE said that CW2 could "buy a new car, get an apartment, and go

fucking get your shit together." PIERCE said that he (PIERCE) would use the money to "pay a

few bills."

    38.    The San Luis Obispo Sheriff's Office narcotics task force office recently installed

a camera in its office space to capture the area surrounding its evidence storage location. A

detective on the task force recently reviewed video captured by the camera on January 31, 2013.

According to the video, the last employee remaining in the office left at 5:20 p.m. Soon after

that employee left, the video showed PIERCE opening the office door and entering the space.

The video showed that PIERCE went directly to the sergeant's desk and removed the evidence

14

key from the top of his desk.  According to the video, PIERCE then opened the evidence storage area with the key and removed a sack from the storage location.  The detective reviewing the video recognized the sack as one that contained the placebo pills resembling oxycodone.  The video then showed PIERCE then grabbing two bottles from the sack, returning the evidence key to the sergeant's desk, removing plastic wrap surrounding the bottles, and then exiting the office. The detective stated that the video showed that PIERCE was only inside of the office for approximately two minutes.

39.     About twenty minutes later, at approximately 5:45 p.m., surveillance showed that PIERCE parked a silver Dodge Durango at a location near the Avila Grocery and Deli in Avila Beach, CA.  A surveillance agent saw CW2 enter PIERCE's car.  Once inside, CW2 recorded a conversation with PIERCE.[11]  PIERCE informed CW2 that Individual B was "off the hook." CW2 said they should "jack" Individual B.  PIERCE again responded that this was "jacking him."  CW2 suggested that they purchase a couple of ounces of heroin from Individual B to sell. PIERCE refused and said that he was concerned that CW2 would use it and overdose.  PIERCE stated that an old heroin user told PIERCE that Individual B had been "doing this a while" and "dealing with some pretty big people."  PIERCE said that he did not want to lose his job and that this deal "keeps my hands clean, I can get a little extra cash" and that he was "fucking helping you out."  CW2, referring to the incident in which PIERCE took the fireworks and morphine pills from Individual A, asked if Individual A "ever went to the police."  PIERCE said that Individual A did not.  PIERCE instructed CW2 not to tell CW1 about their dealings because CW1 would "blab her mouth."  PIERCE informed CW2 that there were more pills.  PIERCE informed CW2 that they seized a bunch of methamphetamines that day.  CW2 asked if PIERCE

---

[11] Agents searched CW2 before the meeting and found no contraband on him.

15

had any for CW2.  PIERCE responded, "No, I told you – ain't gonna fucking happen."  After the

meeting, CW2 provided agents with two white plastic pill bottles containing 200 pills.  Agents

searched CW2 and found no money or contraband.

40.     On February 1, 2013, CW2 recorded a conversation with PIERCE and informed

him that CW2 had the money.  PIERCE replied that he would meet CW2 in Avila Beach as soon

as CW2 was available.

41.     After the telephone call, agents met with CW2, searched him, and found $2,317.

Agents held on to the money until the conclusion of CW2's meeting with PIERCE.  Agents then

provided CW2 with $8,000.  Approximately one hour later, CW2 recorded a meeting with

PIERCE in a silver Dodge Durango in Avila Beach.  During the meeting, PIERCE instructed

CW2 to count out $4,000 for PIERCE and to keep the other $4,000.  PIERCE asked when

Individual B wanted more pills and agreed to do one last deal, but this time for $50 a pill.

PIERCE and CW2 agreed that they would sell Individual B three-hundred pills for a total of

$15,000.  After the meeting, agents searched CW2 and found $4,000, but no other money or

contraband.  CW2 then recorded another conversation with PIERCE and stated that CW2 had

spoken with Individual B, who wanted more pills.  PIERCE said that he could grab the pills

during the weekend if needed.

42.     After the recorded meeting in which PIERCE received $4,000, an agent saw the

silver Dodge Durango pull into a parking lot near Sesloc Federal Credit Union in Arroyo Grande

at approximately 3:20 p.m.  At approximately 4:31 p.m., an FBI employee saw the silver Dodge

Durango arrive at the PIERCE's residence at 555 St. Remy Place in Arroyo Grande.  At

approximately 4:32 p.m., the same FBI employee observed PIERCE opening the right front

passenger door of the silver Dodge Durango and grabbing an unidentified object within the

16

vehicle. Approximately one minute later, the FBI employee observed PIERCE walk toward his residence and out of view.

43. According to an employee of the Sesloc Federal Credit Union and its records, PIERCE deposited twenty $100 bills (a total of $2,000), into a checking account that he held with his wife at the credit union. The credit union was able to identify ten of the $100 bills PIERCE deposited. All ten bore the same serial numbers as the bills the FBI provided to CW2 on February 1, 2013.

## IV.    CONCLUSION

44. For all the reasons described above, there is probable cause to believe that from February 4, 2012 to February 3, 2013, PIERCE, an agent of the City of San Luis Obispo, based on his employment as a detective with the San Luis Obispo Police Department, corruptly solicited, demanded, accepted, and agreed to accept, cash from CW1 and CW2 intending to be influenced and rewarded in connection with any business, transaction, or series of transactions of the City of San Luis Obispo, involving a thing of value of $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B).

/s/

_____
Dieter Willkomm, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 4th day of February, 2013.

Frederick F. Mumm
_____
HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE